UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| AMANDA JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 17-cv-10789 |
| | ) |
| CENTRAL INTELLIGENCE AGENCY | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S REPLY IN SUPPORT OF SUMMARY JUDGMENT**

**A.  INTRODUCTION**

Although the Central Intelligence Agency ("CIA" or "Agency") produced very few documents in response to Plaintiff's request under the Freedom of Information Act ("FOIA"), this fact does not show that the CIA's search and production was improper. *Stalcup v. Central Intelligence Agency,* 768 F.3d 65, 74 (1st Cir. 2014); *Olesky v. U.S. Dept. of Defense,* 658 F. Supp.2d 288, 298 (D. Mass. 2009). Although Plaintiff suggests in her Opposition that her request for documents was much broader than the documents produced, in fact, Plaintiff's request was a narrow one, and the CIA produced documents responsive to the request, with appropriate redactions, after a reasonable search for those documents. Plaintiff's request sought teaching materials used by the CIA for its @CIA Twitter Account (the "Account"), but her

1

Opposition now argues that her request included all materials related to the Account. The CIA was obligated to produce the documents actually requested, as the request reasonably read, and nothing more. Moreover, Plaintiff is incorrect in her argument that the CIA was required to create new records, as noted in the authority that she cites. In addition, Plaintiff cannot complain that the CIA redacted too much material from the produced documents, because the redactions are firmly based on the applicable statutory exemptions and related case law.

## ARGUMENT

### I. The CIA Conducted a Search for the Documents that Plaintiff Requested.

Plaintiff takes the position that the CIA "impermissibly narrow[ed] the scope of Plaintiff's request." Plaintiff made three specific and clearly worded requests. Plaintiff's second request, to which her Opposition is largely devoted, sought:

> A copy of any documents or materials, including but not limited to, guides, manuals, handbooks, policies, or presentations used to instruct or train agency personnel in the use of the @CIA Account;

The CIA identified two limiting elements in Plaintiff's request. First, the request seeks only materials "*used* to instruct or train Agency personnel," (emphasis added). As a result, documents that were *not actually used* for training officers in the use of the account were not deemed responsive to the request. This limitation explains and rebuts most of Plaintiff's examples of improper withholding of documents.

Second, the request seeks only materials used to "instruct or train" agency personnel. The request denotes materials used in some pedagogical fashion above and beyond simply any document on the topic of Twitter that might be argued to have informed in some sense the

Agency's use of its Twitter account.[1]  All of Plaintiff's examples of overlooked or unproduced documents fall outside of her actual, literal request.

Plaintiff seeks the Court's intervention for the CIA's failure to search for or produce documents that, in fact, do not respond to the language of Plaintiff's request.  For example,

- Plaintiff asserts that CIA should have searched records from the CIA Office of General Counsel ("OGC"), Chief Information Officer ("CIO") and "Web Council."  Opp. at 8.  Plaintiff concedes, however, that the Agency did produce the guidance to which these offices contributed that was actually "used to instruct or train agency personnel in the use of the @CIA Account."  Plaintiff's argument appears to be that the CIA improperly failed to produce other, hypothetical records possessed by the individual offices reflecting these offices' review of such guidance in draft form.  If such records existed, they would not be responsive Plaintiff's request because, by definition, such drafts would not have been "used to instruct or train agency personnel in the use of the @CIA Account."

- Plaintiff asserts that the CIA improperly excluded search for Prepublication Review Board ("PRB") records.  As described in the Agency's Declaration, the PRB reviews materials intended for publication in any format to determine whether they are classified.  Declaration of Antoinette B. Shiner, Information Review Officer, Litigation Information Review Office, CIA, ¶ 14 (Jan. 22, 2018).  According to Plaintiff, "if the PRB determines that material should not be released, the PRB must then instruct OPA not to publish the material . . . Any written material generated as part of that review is therefore obviously 'materials' used to "instruct or train…'"  Plaintiff gratuitously adds the word "instruct" in this description, but the term is not found in the Social Media SOP document Plaintiff cites and in no way renders the PRB's records responsive.  A classification determination neither "instruct[s]" nor "train[s]" anyone in anything, and certainly not in "the use of the

---

[1] In her Opposition, Plaintiff repeatedly attempts to broaden this request by employing an alternative definition of "instruct" to mean something akin to the issuance of an order or dictum.  The specific examples Plaintiff used to explain her original request, however, eliminate any doubt regarding materials use to "train or instruct." The lone examples provided, "guides, manuals, handbooks, policies, or presentations" share a clear common element: they are documents created for the purpose of teaching and informing others about applicable guidance.  The interpretation in the Opposition that "instruct" refers broadly to anything that could be construed as information regarding operation of the @CIA account is belied by the surrounding language and content of Plaintiff's request.  The grammatical construction of Plaintiff's request to seek "materials . . . used to instruct . . . in the use of the @CIA Account" also supports Defendant's interpretation; providing instruction "in" something clearly refers to teaching, whereas Plaintiff now seeks to expand the definition to would mean an order to do (or not do) something.  The Agency's interpretation was reasonable here, and Plaintiff's is not.

@CIA account." OPA well knows that it may not publicly disclose classified information in any form. PRB's classification determinations therefore pertain not to "instruct[ion] or train[ing] . . . in the use of the @CIA account," but are restricted to whether particular facts—whether intended to be tweeted, emailed, or publicly spoken—are or are not classified. PRB determinations regarding tweets are no more "instruction" on use of @CIA than the PRB's determinations regarding books are instruction on novel-writing.

- Plaintiff argues that records regarding then-Director Brennan's selection of the Agency's first post to its twitter account are responsive to her request. Plaintiff's characterization of the Director's choice as an "instruction" regarding what to post does not render such information responsive to Plaintiff's specific request. As noted, Plaintiff seeks to apply an alternative definition of "instruct" (i.e. the issuance of an order or dictum, *see* footnote 1, *supra*) when, in fact, the actual language and examples used in Plaintiff's request make it clear that Plaintiff was seeking documents used for teaching purposes. There was no overt pedagogical content to the Director's choice, nor was it incorporated into training or instruction materials actually used by CIA personnel. The Director's choice of tweet therefore does not amount to "materials . . . used to instruct or train [A]gency personnel" in the use of the @CIA account.

- Plaintiff argues the Agency should have produced records regarding OPA staff participation on "listserv" email lists "where government employees exchange advice and experiences regarding their use of social media." Again, by Plaintiff's own description of these Internet listserv exchanges, these documents fall outside Plaintiff's request for "materials . . . used to instruct or train agency personnel." At most, they would amount to an informal dialogue between agencies regarding individual employees' thoughts on the use of social media. Notwithstanding Plaintiff's apparent interest in this separate topic, these documents were not part of her request.

- Plaintiff argues that the "near-total lack of intra-agency communications in this production indicates countless overlooked records related to the operation of the Account." The CIA in fact, did not produce emails "related to the operation of the Account" because such emails, without more, *would not be responsive to any of Plaintiff's requests* unless they were used to "instruct or train" Agency officers in the use of the account. This is particularly so in light of the fact that—as stated in the Agency's declaration—only one OPA employee was primarily in charge of the Account.

Plaintiff is not entitled to production of documents beyond the scope of her initial request, nor is the Agency required to search for and release such documents. *Casillas v. Dept. of Justice*, 672 F. Supp. 2d 45, 48 (D.D.C. 2009). As noted, Plaintiff attempts to demonstrate the inadequacy of the CIA's production by citing examples including intra-agency emails on the

subject of the @CIA account, Opposition, at 11; records created when an office "approve[s] guidance" that is later used to instruct agency personnel, *id.* at 8; classification determinations of the Prepublications Review Board, *id.*; and Director Brennan's selection of the first post, *id.* at 9; yet none of these examples are called for by the language of Plaintiff's requests.  Plaintiff is not entitled to expand the scope of her narrow request for training materials beyond what her request reasonably supports.   Plaintiff cannot alter and expand the scope of her requests, while continuing to insist on the priority date afforded her initial letter.  *See Kowalczyk v. Dept. of Justice*, 73 F.3d 386, 387 (D.C. Cir. 1996) (government was not required to conduct additional, expanded searches based on the requester's subsequent clarification of the scope of the request); *Casillas*, at 48 ("The FOIA does not obligate an agency to search for records that are not within the scope of the initial request.").

Plaintiff's final request seeks a list of user applications connected to the @CIA Account on the Twitter platform.  Plaintiff takes the position that the Agency is required to produce these records because she provided the Agency with step-by-step instructions on how to retrieve the requested information from a third-party website.  However, these instructions would require the Agency to create a record that does not already exist. After searching for the document in the relevant Agency records systems and returning a result of "No Records Located," the Agency concluded its search.

## II.   The Agency Conducted a Reasonable Search for Responsive Records

In objecting to the CIA's search for responsive records, Plaintiff relies primarily on speculation as to the existence of overlooked records, and as to the structure and functions of Agency offices and record systems. The adequacy of the CIA's search is determined not by "whether relevant documents might exist, but whether the agency's search was 'reasonably

calculated to discover the requested documents.'" *Moffat v. U.S. Dept. of Justice,* 716 F.3d 244, 254 (1st Cir. 2013). Speculative claims of overlooked documents are insufficient to overcome the good faith presumption afforded the Agency's search and supporting affidavit. *Stalcup v. CIA*, 786 F.3d 65, 74 (1st Cir. 2014). As described below, the CIA provided enough significant, detailed information in its Declaration to permit Plaintiff to understand how the CIA constructed its record searches.

### i. Records Systems Searched

The CIA has submitted a declaration, attested to by Antoinette B. Shiner, the Agency's Litigation Information Review Officer, detailing the offices and systems searched. The Declaration explains that the Office of Public Affairs (OPA) is the only office within CIA with access to and responsibility for the administration of the official CIA Twitter account. Shiner Decl. ¶ 9. Therefore, any communications regarding the CIA Twitter account, or materials relating to the Twitter account would be expected to pass through OPA and to be contained within OPA's records. Based on this information, the CIA search team reasonably limited its searches for responsive materials to OPA's records system, recognizing OPA as the office most likely to possess the requested information. *See, e.g.*, *Sephton v. F.B.I.*, 365 F. Supp. 2d 91, 100 (D. Mass. 2005), *aff'd* 442 F.3d 20 (1st Cir. 2006); *Karantsalis v. Dept. of Justice*, 635 F.3d 497, 500-501 (11th Cir. 2011) (affirming district court's determination that the agency's search for records was reasonable when it searched the system most likely to contain the requested records); *Cause of Action v. IRS*, 253 F. Supp. 3d 149, 156 (D.D.C. 2017) (finding that the agency's affidavits need not detail the efforts of an epic search, so long as the affidavit provides the agency's rational for searching certain places and not others).

As the Shiner Declaration indicates, the Agency search team worked with OPA to identify the specific personnel responsible for maintaining the @CIA account. Shiner Decl. ¶ 10. After identifying the person responsible for administering the account, communicating with Twitter, and posting information to the account, the CIA searched that account for responsive records. *Id.* The Agency's decision to narrow the location of its email search to this account was reasonable because this is the account where responsive communications are most likely to be found. *See Sephton*, 365 F. Supp. 2d at 100. Given the nature of the position and its job responsibilities, any communications relating to the @CIA Twitter account, and responsive to Plaintiff's requests, are likely to have been sent to, from, or through this account.

Plaintiff objects that the Agency has not specifically identified the individual whose emails were searched. Opposition, p. 6. However, the CIA's decision not to identify the job title or name of the individual is consistent with FOIA protections as well as longstanding CIA policy, and cannot render the search inadequate. Moreover, the Shiner Declaration provides detail on this point, identifying the Agency office responsible for the administration of the account (OPA), the team within that office responsible for both communications with social media platforms and content shared on social media (the OPA Web) Team, and stating that the officer on that team responsible for the @CIA Twitter account was specifically identified. Shiner Decl. ¶¶ 9-10. The CIA has provided sufficient detail about where and how it structured its search for responsive records to allow the Court to evaluate its reasonableness. To provide greater detail would vitiate the protections afforded by FOIA Exemptions 3 and 6. As discussed in greater detail below, the CIA is entitled to withhold the names and job titles of CIA personnel. Revealing the name and job title of the person holding the email account searched would not

demonstrate with any greater clarity the sufficiency of the Agency's search, but would negate the reasons for these exemptions.

### ii.  Supposedly Overlooked Documents

As discussed in Part I, Plaintiff points to a number of records—nearly all of which fall beyond the scope of this request— that she wants, but did not receive.  First, as noted, nearly all of these supposedly "overlooked" records are beyond the scope of Plaintiff's narrow request.  Moreover, even if the documents cited by Plaintiff were responsive—and they are not—the Agency's search was clearly adequate here.  Plaintiff cannot rely on the mere speculation of the existence and discoverability of additional responsive documents. *Maynard v. CIA*, 986 F.2d 547, 559 (1st Cir. 1992), *quoting Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).  Plaintiff sets forth what she describes as an "inference" that other emails or documents she would like to receive may exist and that they might have been discovered, had the Agency conducted its search differently.  This speculation is insufficient to demonstrate that they Agency's search was inadequate.  *Maynard*, 986 F.2d at 559.  Even had Plaintiff identified a document that the Agency failed to produce, "[t]he omission of a single document . . . does not negate what is otherwise a reasonable inquiry." *Stalcup v. CIA*, 768 F.3d 65, 74 (1st Cir. 2014).  The crucial question is not whether the Agency discovered every single document responsive to Plaintiff's request, but whether the Agency's search for responsive documents was reasonably calculated to produce the information requested.  *Id.*, *quoting Oglesby v. Dept. of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Moffat v. U.S. Dept. of Justice,* 716 F.3d 244, 254 (1st Cir. 2013) (adequacy of the search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search).  As discussed in Part II.i. above, it was.

### iii. The Agency Completed Processing of Plaintiff's Third Request

Plaintiff takes the position that the Agency has refused to process the third part of her request, which asks for a list of user applications connected to the @CIA Twitter account. The Agency did undertake this search. The Agency searched OPA records, as described above, and returned a result of "No Records Located" for this request. Supplemental Declaration of Antoinette B. Shiner (March 27, 2018). Plaintiff has repeatedly offered instructions on how to access the requested information on Twitter's website. Plaintiff's instructions, however, are instructions on how to <u>create</u> a new record. The FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger v. Reporters Comm. for Freedom of the* Press, 445 U.S. 136, 152 (1980).

Plaintiff relies on *National Security Counselors v. Central Intelligence Agency* for the proposition that the Agency is required to follow her instructions to access and print the applications list because "review[ing] computerized records would not amount to the creation of records." *NSC I*, 898 F. Supp. 2d 233, 270 (D.D.C. 2012). While the court in *National Security Counselors I* does cite to the quoted language, the court's decision stands for the *opposite proposition*, as it applies here. *NSC I* distinguishes between records and files stored electronically, on one hand, and a "listing or index of records" on the other. *Id.* at 271. The court held that "[p]roducing a listing or index of records, however, is different than producing particular points of data (i.e., the records themselves)." *Id.* A request seeking a database listing "whether produced in the format of a print out, a 'screen shot,' or something similar," is a request that would require the creation of a new record, "insofar as the agency has not previously created and retained such a listing or index." *Id.*; *accord, People for the American Way*, 451 F.

Supp. 2d 6, 15 (D.D.C. 2006) (producing a "list of records returned from [a database] search" is "something that FOIA does not mandate" because "the list was not previously created or obtained by the agency" and "an order that defendant produce such a list would be tantamount to requiring defendant to create an agency record"); *Brown v. Perez*, 835 F.3d 1223, 1237 (10th Cir. 2016) (FOIA does not require the agency to produce printouts of screen shots because to do so would require creation of a new record).

Here, the CIA searched the appropriate records system for the requested document and did not find such a document. Supplemental Shiner Decl. at ¶ 5. While Plaintiff instructed the Agency in how to create the record that she requests, her instructions would have the Agency create a record it has not previously created and retained. The Agency is not required to do so. *National Sec. Counselors v. CIA II*, 960 F. Supp. 2d 101, 160 (D.D.C. 2013) (the capability to easily generate a list or index irrelevant because the FOIA does not require agencies to produce records they have not, in fact, chosen to create and retain); *accord Yeager*, 678 F.2d 315, 321 (D.C. Cir. 1982).

### III. The CIA Properly Applied FOIA Exemptions (b)(3), (b)(5), and (b)(6)

#### i. The CIA Properly Applied Exemption (b)(3)

With regard to information protected by Exemption 3, only two questions are relevant: first, whether the statute applied is a qualifying withholding statute; and second, whether the information withheld properly falls within the statute's protection. *Maynard*, 986 F.2d at 554, *quoting CIA v. Sims*, 471 U.S. 159, 167 (1985). Both the National Security Act and the CIA Act qualify as withholding statutes under Exemption 3. The Agency's declaration describes the nature of the information withheld pursuant to these statutes and it articulates the potential harm posed by the disclosure of such information—a level of detail far exceeding what is required for

agencies to justify their withholdings. *See Katsiaficas v. CIA*, 2017 WL 2172437 at 8 (May 17, 2017) (finding the agency's "justification for invoking a FOIA exemption is sufficient if it appears logical or plausible"); *Maynard*, 986 F.2d at 554, *quoting Aronson v. IRS*, 973 F.2d 962, 965, 967 (1st Cir. 1992).

Plaintiff takes the position that the Agency's redactions pursuant to the CIA Act are "inappropriate to the extent that they withhold the names of" employees that have been acknowledged to the public; Opposition at 16, *relying on N.Y. Times Co. v. Dept. of Justice*, 756 F.3d 100, 116-17 (2d Cir. 2014) (regarding the waiver of the Exemption 5 attorney-client privilege and deliberative process privilege). However, the CIA Act confers absolute authority to the CIA to withhold "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. The CIA Act does not require the Agency to articulate any potential harm to National Security from the disclosure of such information, nor does the prior disclosure of such information invalidate the Act's protections. *Id.* The protections of Exemption 3 and the CIA Act are not based in the principles of traditional legal privileges as is Exemption 5. The CIA Act's protection of the identities of individuals employed by the Agency is not waived in all circumstances when an individual employee self identifies as such in other circumstances.

    ii.    **The CIA Properly Applied Exemption (b)(5)**

The information the CIA withheld under Exemption 5's deliberative process privilege is both "deliberative" and "predecisional." *Stalcup*, 768 F.3d at 70. As described in the Shiner Declaration, the information withheld pursuant to Exemption 5 is contained in a document circulated only within the Agency itself, and provides factors for decision makers within the Agency to weigh in deciding whether to engage in certain activities on social media. The

information does not present a formal policy determination directing employees to take action, rather it provides them with considerations to assist the process of making particular decisions regarding use of Twitter. *See Town of Norfolk v. U.S. Army Corp of Engineers*, 968 F.2d 1438, 1458 (1st Cir. 1992). Furthermore, as Plaintiff points out, the document at issue contains "no title or given creation date." Declaration of Andrew Sellars (February 23, 2018) at 2. There is no indication that this document was ever formally adopted as agency policy. The Agency could have withheld the document in full, but instead provided Plaintiff with as much information as possible.

### iii. The CIA Properly Applied Exemption (b)(6)

Exemption 6 provides that the government may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *U.S. Dept. of State v. Ray,* 502 U.S. 164, 174-75 (1991). The term "similar files" in Exemption 6 is construed broadly and includes any information like that contained within personnel or medical files, the disclosure of which may result in injury or embarrassment of the individual. *U.S. Dept. of State v. Wash. Post Co.*, 456 U.S. 595, 599-603 (1982). This refers to all information that "applies to a particular individual." *Id.* at 602. *See Bigwood v. USAID,* 484 F. Supp.2d 68, 76 (D.D.C.2007)("[T]he organizational identity of USAID grantees is information which . . . 'applies to a particular individual,' and thus the requested records are "'similar files'" which may be protected from disclosure by Exemption 6.") *See generally, Cook v. Nat'l Archives and Records Admin.,* 758 F.3d 168 (2d Cir.2014). The privacy protection afforded by Exemption 6 exists to shield the content of the information and guard against the harm to the individual's privacy interest. Application of the Exemption

"was not intended to turn upon the label of the file which contains the damaging information." *Wash. Post*, 456 U.S. at 601.

In determining whether private information is properly withheld under Exemption 6, the Court is to engage in a balancing act, weighing the privacy interest of the individual against the public interest in disclosure. The "only relevant 'public interest in disclosure' to be weighed . . . is the extent to which disclosure would serve the core purpose of the FOIA, which is 'contribut[ing] significantly to public understanding *of the operations or activities of the government*.'"  *U.S. Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 496 (1994). *See Multi Ag Media LLC v. USDA,* 515 F.3d 1224, 1228 (D.C. Cir. 2008)*; News-Press v. DHS,* 489 F.3d 1173, 1205 (489 F.3d 1173, 1196-97 (11st Cir. 2007). That is, the Court is to engage in a balancing test, weighing the privacy interest of the individual against the public's interest in disclosure. *Multi Ag Media* 515 F.3d at 1228; *News Press,* 489 F.3d at 1196-97; *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 84 (D.D.C. 2003).

Plaintiff takes the position that the public has an interest in the names and job titles of Twitter employees because this information may reveal the nature of the CIA's "engagement with the platform." Opposition at 19-20. However, the Agency has produced the <u>content</u> of its communications with Twitter, which reveals the nature of Twitter's relationship and involvement with the platform. Given that the content has been produced, disclosure of the names and job titles of Twitter's employees would not enhance the public's understanding of the CIA's activities. Disclosure could, however, expose Twitter employees to targeting by foreign intelligence services or adversaries eager for information, or simply to harassment, threats, or intimidation should their names and affiliation with the Agency be revealed. On balance, the

privacy interests of these individuals outweigh the public's minimal—indeed, nonexistent—interest in the names and job titles sought, and this information was properly withheld.

## CONCLUSION

For the foregoing reasons, the CIA requests that the Court grant summary judgment in its favor because it conducted reasonable searches of its records and produced all responsive documents, withholding information where proper pursuant to Exemptions 3, 5, and 6 of the FOIA.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Anita Johnson*_____
ANITA JOHNSON, BBO No. 565540
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
One Courthouse Way - Suite 9200
Boston, MA 02210
(617) 748-3266

Anita.johnson@usdoj.gov

Certificate of Service

I certify that the foregoing will be filed through the electronic filing system of the Court, which system will serve counsel for Plaintiff electronically on this 27th day of March 2018.

*/s/  Anita Johnson*_____