UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

AMANDA JOHNSON,                     )
                                    )
          Plaintiff,                )
     v.                             )          CIVIL ACTION
                                    )          NO.  17-10789-JGD
CENTRAL INTELLIGENCE AGENCY,        )
                                    )
          Defendant.                )

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

September 17, 2018

DEIN, U.S.M.J.

### I.  INTRODUCTION

The Plaintiff, Dr. Amanda Johnson, brings this action under the Freedom of Information

Act ("FOIA"), 5 U.S.C. § 552, to compel disclosure of three sets of documents held by the

Defendant, the Central Intelligence Agency (the "Agency"), pertaining to the Agency's Twitter

account.  This matter is presently before the Court on "Defendant's Motion for Summary

Judgment" (Docket No. 23) (the "Motion").  The Agency argues that summary judgment is

appropriate because it has conducted a reasonable search for the requested documents and

has properly withheld certain information under the FOIA exemptions provided by 5 U.S.C.

§§ 552 (b)(3), (b)(5) and (b)(6).[1]  Dr. Johnson opposes the Motion, arguing that the search was

inadequate and that the alleged exemptions do not apply.

---

[1] Referred to herein as "Exemption (b)(3)," "Exemption (b)(5)," and "Exemption (b)(6)."

After careful consideration of the parties' written and oral arguments, the Motion is hereby DENIED.  First, while the search was reasonable in some respects, the Agency was unreasonable in limiting its search related to the second request to one Agency department and in failing to search for the document sought in the third request.  Next, while the Agency correctly applied Exemption (b)(3), it improperly asserted Exemption (b)(5) and Exemption (b)(6).  The parties are ordered to meet and confer regarding additional productions in accordance with this Order.  The parties shall file a joint status report within 21 days of the date of this Order.

## II. <u>STATEMENT OF FACTS</u>[2]

### <u>The FOIA Requests</u>

The Plaintiff in this case is Dr. Amanda Johnson, who, at the time she filed the relevant FOIA request, was a PhD candidate at the Massachusetts Institute of Technology and a Research Affiliate at Harvard University.  FOIA Request at 1.  On December 19, 2014, Dr. Johnson submitted a FOIA request seeking three sets of records related to the Agency's use of the social media platform Twitter.  DF ¶ 1; PF ¶ 1.  Dr. Johnson studies the government's use of social media and submitted the FOIA request for the purpose of using Agency documents in a research article.  FOIA Request at 1.  The requests were as follows:

---

[2]  Unless otherwise indicated, the facts are derived from the Statement of Undisputed Material Facts found at pages 1-3 of Defendant's Memorandum in Support of its Motion (Docket. No. 24) ("DF"), the Declaration of Antoinette Shiner attached to Defendant's Memorandum (Docket No. 24-1) ("Shiner Decl."), the Supplemental Declaration of Antoinette Shiner attached to Defendant's Reply in Support of its Motion (Docket No. 37-1) ("Supp. Shiner Decl."), the Plaintiff's Statement of Facts found at page 2 of Plaintiff's Memorandum in Opposition to the Motion (Docket No. 28) ("PF"), the Declaration of Andrew F. Sellars attached to Plaintiff's Memorandum (Docket No. 28-1) ("Sellars Decl."), the Plaintiff's FOIA Request found at Exhibit A to the Complaint (Docket No. 1-2) ("FOIA Request"), and the Joint Status Report submitted by the parties on November 2, 2017 (Docket No. 19) ("Joint Status Report").

1.  A copy of any electronic or written communication, including emails and email attachments, discussing the CIA's public-facing Twitter account, *@CIA*, sent between Twitter, Inc. or a representative thereof, and any employee in the CIA's Office of Public Affairs.  The request is meant to include both records sent from Twitter to CIA personnel as well as records sent from CIA personnel to Twitter.  This correspondence would exist, as it is a necessary component of the process by which Twitter certifies certain accounts as "verified," and the CIA has a verified Twitter account.  CIA Director of Public Affairs Dean Boyd discussed the CIA's use of this verified, public-facing Twitter account on the CBS News story available at http://www.cbsnews.com/news/cia-twitter-account-an-inside-look-cia/.

2.  A copy of any documents or materials, including but not limited to, guides, manuals, handbooks, policies, or presentations used to instruct or train agency personnel in the use of the agency's public-facing Twitter account, *@CIA*.  This request includes any documents that speak to the style or tone that agency personnel are directed to adopt in their use of this account.

3.  The list of user applications connected to the CIA's public-facing Twitter account, *@CIA*.  This record is stored on the *@CIA* Twitter account web-page and can be accessed by logging into the account, clicking on the user icon in the top right corner, selecting "Settings," and then selecting "Apps." It can also be accessed by logging into the account and navigating to the following web address: http://twitter.com/settings/applications.

Id.  Dr. Johnson limited her requests to records created between August 1, 2012 and the date the request was processed.  Id.

On May 4, 2017, Dr. Johnson filed this action for injunctive relief, complaining that the Agency had not responded to her December 2014 request.  Docket No. 1.  During the course of pretrial proceedings, the parties met and conferred in an attempt to resolve, or narrow, their dispute.  The Agency eventually responded to the FOIA request with the production of eighteen documents, a substantial portion of which were redacted.  Joint Status Report at 2.  Dr. Johnson, through counsel, responded to the production raising various concerns about the sufficiency of the search and of the production.  PF ¶ 3.  The Agency declined to conduct any

additional searches and elected to proceed with its motion for summary judgment.  Sellars

Decl. ¶ 14.

### The Agency's Search for Documents

As is customary in FOIA cases, the Agency has submitted an Affidavit with its Motion

detailing the parameters of its search and the reasons for withholding any relevant

information.[3]  The Affidavit was executed by Antoinette B. Shiner, the Agency's Litigation

Information Review Officer.  Shiner Decl. ¶ 2.  Therein, Ms. Shiner explains that in processing

Dr. Johnson's three requests, officials from the Agency's Information Management Services

("IMS") office, the department that receives FOIA requests, worked with the Office of the

General Counsel ("OGC") to develop a search strategy.  Id. ¶ 9.  They worked to identify the

offices and persons within the Agency who would have responsive documents.  Id.  Ms. Shiner

declares that based on those efforts, the Agency determined that the Office of Public Affairs

("OPA") "would be the only Agency office reasonably likely to possess records responsive to

Plaintiff's request."  Id.[4]  She explains that OPA is the office responsible for communicating with

outside audiences as well as for managing the Agency's web and social media presence.  Id.  As

such, OPA is "the only office within [the Agency] authorized to access the @CIA Twitter account

[and the] OPA Web Team maintains control over content shared via the Agency's social media,

---

[3]  This Court recognizes that Ms. Shiner has submitted a Supplemental Declaration that discusses the
period covered by the search.  Her original Declaration contains details of the Agency's search.  For
convenience, the Court will refer to "Affidavit" in the singular, although its references shall be deemed
to include the Supplemental Declaration where appropriate.

[4]  Dr. Johnson's first request was already limited to OPA, but the second two requests were not.

and communications with social media platforms for the purposes of account maintenance and verification." Id.

Within OPA, the Agency looked for responsive documents by enlisting search terms and custodians to narrow the search.  Id. ¶ 10.  Agency personnel first used variations of search terms such as "Twitter," "guides," "manuals," "policies," and "OPA."  Id.  In response to the large volume of non-responsive documents which contained those search terms, IMS worked with OPA to narrow the search further by custodian, identifying the specific Agency personnel responsible for maintaining the Twitter account and running the search terms through those accounts.  Id. ¶ 10; Supp. Shiner Decl. ¶ 4.

The Agency's Affidavit also addressed two concerns that Dr. Johnson had raised regarding the search.  First, it explained that the search did not produce a "verification email" or similar communication, as referenced in Dr. Johnson's first request, because verification of the Twitter account was completed via telephone.  Shiner Decl. ¶ 13.  Second, in response to Dr. Johnson's contention that documents responsive to the second request would exist in the records of the Publications Review Board ("PRB"), among other places, the Agency explained its position that the PRB is only responsible for ensuring that classified information is not improperly disclosed and, as such, the Agency contends that it would not be the correct location to search for the training materials sought.  Id. ¶ 14.

The search was completed on June 26, 2017, and the Agency produced eighteen records in response to Dr. Johnson's first and second requests.  Id. ¶¶ 8, 11.  No records were produced in response to the third request.  Supp. Shiner Decl. ¶ 5.  After the Plaintiff challenged the cut-off date the Agency had used for the production, the Agency acknowledged its error and

produced a few more documents.  Id.  ¶¶ 6, 7.  Portions of the production were redacted to

withhold information.  The Agency claims the redactions are appropriate under Exemptions

(b)(3), (b)(5), and (b)(6).  Shiner Decl. ¶¶ 15-23.  Pursuant to Exemption (b)(3), which allows an

agency to withhold information if expressly permitted by another statute, the Agency redacted

the titles, names, functions, and organizational information of Agency employees.  Id. ¶¶ 15-18.

Pursuant to Exemption (b)(5), which allows for withholding of privileged information, the

Agency redacted one document over which it claims the deliberative process privilege.  Id.

¶¶ 19-20.  Pursuant to Exemption (b)(6), which allows for the withholding of certain personal

information, the Agency redacted the names, email addresses, and job titles of employees at

both the Agency and at Twitter.  Id. ¶¶ 21-23.  The Agency has provided explanations for its

withholdings both in the Shiner Declaration as well as in a "Vaughn Index" attached to its

memorandum.  (Docket No. 24-2).[5]  Subsequent briefing following oral argument on the Motion

further explained the Agency's reasons for withholding some documents.  See Docket Nos. 45,

51.

Additional facts will be provided below where appropriate.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review for FOIA Requests

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co.,

794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822

---

[5] As the First Circuit explained in Church of Scientology Int'l v. U.S. Dep't of Justice, 30 F.3d 224, 227 n.4 (1st Cir. 1994), the name of the index which explains the basis for the Agency's decision to withhold is derived from the seminal case of Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

(1st Cir. 1991)).  The burden is upon the moving party to show, based upon the discovery and disclosed materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that "possess[] the capacity to sway the outcome of the litigation under the applicable law[,]" and there is a genuine dispute where an issue "may reasonably be resolved in favor of either party."  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotations and citations omitted).  The Court must "review the material presented in the light most favorable to the non-movant, and [] must indulge all inferences favorable to that party."  Petitti v. N.E. Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) (internal quotations and citation omitted).

When a properly supported motion for summary judgment is made, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotations and citation omitted).  The non-moving party can then avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  A party may not rely on "conclusory allegations, improbable inferences, [or] unsupported speculation" to overcome a motion for summary judgment.  Crawford v. Lamantia, 34 F.3d 28, 31 (1st Cir. 1994) (internal quotations and citation omitted).

In the context of a FOIA request, summary judgment should be granted to a producing agency "when the agency proves that it has fully discharged its obligations under the FOIA after the underlying facts and the inferences to be drawn from them are construed in the light most

favorable to the FOIA requester." <u>Moffat v. U.S. Dep't of Justice</u>, Civil Action No. 09-12067-DJC, 2011 WL 3475440, at *1 (D. Mass. Aug. 5, 2011) (internal quotations and citations omitted). "An agency fully discharges its burden when it proves that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the FOIA's inspection requirements." <u>Id.</u> (internal quotations and citations omitted). "Summary judgment in FOIA cases may be granted solely on the basis of agency affidavits." <u>Id.</u> (internal quotations and citations omitted).

**B.      Reasonableness of the Agency's Search**

The Agency first contends that it is entitled to summary judgment because the undisputed facts establish that its search was reasonable. As a result, it argues, it should not be required to search for other responsive documents. Dr. Johnson challenges both the sufficiency of the Agency's Affidavits, and the scope of the Agency's search. In addition, the parties dispute whether requiring the Agency to locate and produce a computer-generated document by following express access instructions is required by the FOIA. For the reasons detailed herein, this Court concludes that while the Agency's Affidavit is sufficient, the scope of the search was inadequate in various respects. Moreover, the Agency is required to access and produce the identified computer-generated document.

**1.      The Agency's Obligation to Search**

In order to carry its burden of showing that it has met its obligation to conduct an adequate search, the Agency "must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." <u>Nation Magazine v. U.S. Customs Serv.</u>, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotations and citation omitted). "Resolution

of this claim turns on whether the agency made a good faith, reasonable effort using methods which can be reasonably expected to produce the information requested." Stalcup v. CIA, 768 F.3d 65, 74 (1st Cir. 2014) (internal quotations and citation omitted). "The crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." Maynard v. CIA, 986 F.2d 547, 559 (1st Cir. 1993) (internal quotations and citation omitted). "After an agency shows that it acted accordingly, which is generally accomplished through an affidavit, a rebuttable presumption that the agency acted in good faith emerges." Stalcup, 768 F.3d at 74.

Any affidavit must be detailed, nonconclusory, and submitted by responsible officials. Maynard, 986 F.2d at 559. "A satisfactory agency affidavit should, at a minimum, describe in reasonable detail the scope and method by which the search was conducted." Id. It should also "describe at least generally the structure of the agency's file system which makes further search difficult." Id. at 559-60 (quoting Church of Scientology of Cal. v. IRS, 792 F.2d 146, 151 (D.C. Cir. 1986)).

If an agency succeeds in submitting a sufficiently detailed affidavit evidencing a reasonable search, "the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." Id. at 560. The presumption "cannot be rebutted by purely speculative claims about the existence and discoverability of other docu-ments." Id. (internal quotations and citation omitted). On the other hand, if the Agency fails to establish through its affidavits that its search was reasonable, "the FOIA requester may avert summary judgment merely by showing that the agency might have discovered a responsive document had the agency conducted a reasonable search." Id. For the reasons detailed herein,

the search conducted was not sufficient, and the Agency's motion for summary judgment must

be denied.

**2.**     <u>**Sufficiency of the Agency's Affidavit**</u>

As an initial matter, Dr. Johnson contends that the Shriner Declaration is insufficient to

fully explain the scope of the search undertaken by the Agency, so that it is impossible to deter-

mine if the search was reasonable.  Thus, she argues, summary judgment should be denied

because "[t]he affidavit does not state which record systems were searched, how the request

was construed and limited, how the initial records identified were narrowed, or where,

precisely, the agency searched."  Pl. Opp. (Docket No. 28) at 1.  For the reasons detailed herein,

this Court concludes that the Affidavit is sufficient to determine if the Agency's search was

reasonable.

In her Declaration, Shiner explains how Agency officials from IMS and OGC worked to

identify the most likely places in the Agency to have responsive documents.  Shiner Decl. ¶ 9.

Shiner then explains why Agency officials believed OPA to be a sufficient place to locate all

responsive documents to Dr. Johnson's requests.  <u>Id.</u>  Next, the Affidavit details how searches

were conducted within OPA and the search terms used.  <u>Id.</u> ¶ 10.  In the Affidavit, Shiner

further explains that in order to narrow the search to obtain more responsive, and fewer

irrelevant, documents, IMS worked with OPA to identify the specific personnel responsible for

maintaining the @CIA account and applied the search terms to their email accounts.  <u>Id.</u>  This

detailed description of the Agency's search method, which explains the search terms used and

why the Agency initially believed that searching beyond OPA's record system was unnecessary,

is sufficiently detailed to enable the Court to determine if the search was reasonable.  <u>See</u>

[10]

<u>Oleskey ex. rel. Boumediene v. U.S. Dep't of Defense</u>, 658 F. Supp. 2d 288, 294 (D. Mass. 2009) ("Sufficient details in government affidavits may include setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials were searched." (internal quotations and citation omitted)).

### 3.   <u>Adequacy of the Agency's Search</u>

#### <u>Objection to Response to First Request</u>

Dr. Johnson's first request was for electronic or written communications, including emails and email attachments, between Twitter, Inc. and any employee of the OPA "discussing the CIA's public-facing Twitter account, @CIA[.]"  FOIA Request at 1.  She argues that "there is reason to believe that further correspondence exists between Defendant and Twitter related to the set-up and verification of Defendant's Twitter account" and rejects the Agency's explana-tion that there are no documents because the verification was done by telephone and not in writing.  Pl. Opp. at 11-12.  In support of her contention, Dr. Johnson points to a statement in a newspaper article where, in response to the question "[h]ow did the CIA get control of the @CIA handle?," a department spokesman is quoted as saying "CIA filed an impersonation complaint with Twitter and they secured the @CIA account for us, which is routine for government agencies."  Sellars Decl. Ex. M.  While Dr. Johnson contends that this action on the part of the Agency "would have almost certainly generated some communications with Twitter[,]" there is no contention by the Plaintiff that this complaint was likely to have been generated through OPA.  Pl. Opp at 12.

The mere fact that not every possible document was uncovered does not render the search inadequate.  <u>Maynard</u>, 986 F.2d at 559 ("The crucial issue is not whether relevant

documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." (internal quotations and citation omitted)); see also Safety Research & Strategies, Inc. v. U.S. Dep't of Transp., 903 F. Supp. 2d 1, 8 (D.D.C. 2012) ("the mere fact that external communications were not uncovered in [the Agency's] searches is insufficient to defeat summary judgment").  Here, the Agency provided a sufficiently detailed Affidavit by an appropriate person establishing the sufficiency of the search.  The identification of this one document does not rebut the presumption of good faith.  See Stalcup, 768 F.3d at 75 ("The omission of a single document in this case does not negate what is otherwise a reasonable inquiry.").  Nevertheless, the Plaintiff has expressly identified a document, the filing of the impersonation complaint, which arguably falls within the scope of the request.  The public disclosure of the Agency's communication with Twitter relating to setting up the @CIA account may be a "positive indication[] of overlooked materials" that calls into question the adequacy of the search.  See Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 327 (D.C. Cir. 1999).  In light of the fact that summary judgment is being denied for the reasons stated below, in connection with the meet and confer and supplemental production required herein, the Agency shall address why the documents relating to the impersonation complaint (if any) were not produced, and/or produce them if appropriate.

### Objections to Response to Second Request

Dr. Johnson takes issue with two aspects of the Agency's response to her second request.  As cited above, the second request reads:

> A copy of any documents or materials, including but not limited to, guides,
> manuals, handbooks, policies, or presentations used to instruct or train
> agency personnel in the use of the agency's public-facing Twitter account,

> *@CIA*.  This request includes any documents that speak to the style or tone
> that agency personnel are directed to adopt in their use of this account.

FOIA Request No. 2.

Dr. Johnson argues first that the Agency failed to search for documents outside of OPA and second that the Agency failed to search for communications and drafts of documents responsive to this request.  The Court agrees in part.  The Agency was unreasonable to limit its search to OPA but was reasonable in not searching for communications and drafts.

<u>Need to Search Other Departments</u>

The fact that the Agency limited its search for the second request to only one Agency department, OPA, is unreasonable.  Unlike the first request, Dr. Johnson did not limit the second request to records within OPA.  The Agency defended its narrow search by explaining that:

> CIA personnel determined that the [OPA] would be the only Agency office
> reasonably likely to possess records responsive to Plaintiff's request.  The
> OPA is the office within CIA responsible for communicating CIA's mission to
> external audiences, and enhancing public understanding of the Agency by
> managing its web and social media presence.  Not only is it the responsibility
> of the OPA to manage CIA's social media presence, it is the only office within
> CIA authorized to access the @CIA Twitter account.  The OPA Web Team
> maintains control over content shared via the Agency's social media, and
> communications with social media platforms for the purposes of account
> maintenance and verification.

Shiner Decl. ¶ 9.  While this explanation is sufficiently detailed to create a presumption of good faith, contrary indications in the produced documents that responsive documents existed else-where rebut that presumption and preclude summary judgment for the Agency.

Dr. Johnson argues that Defendant's search should have included records held by the OGC, Chief Information Officer ("CIO"), the Web Council and the PRB.  Pl. Opp. at 8.  In making

this argument, Dr. Johnson points to the produced documents, which expressly mention the involvement of other offices in Twitter policies and procedures.  First, the OPA Standard Operating Procedures explain that the OGC has significant responsibilities in reviewing the policies of social media sites used by the Agency and in ensuring compliance with regulations related thereto.  Sellars Decl. Ex. A (Docket No. 28-2) at 8.  It also states that OPA will "[f]ollow legal guidance provided by OGC[,]" that "[o]ther Directorates and Offices and the CIA Web Council may provide or suggest appropriate content[,]" and that content posted on Twitter will have to go through pre-publication review (conducted by the PRB) before being posted.  Id. at 8-9, 13.  Another produced document states that "[p]er OPA's Twitter Guidance approved by OGC and CIO, CIA will ONLY follow organizations and other government entities, CIA will NOT follow personal individual accounts."  Sellars Decl. Ex. B (Docket No. 28-3) at Page 2 of 3.  Citing these references, Dr. Johnson argues that the search could not have been adequate if these other departments were not searched.  This Court agrees.

"While the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search . . . if a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate."  Public Citizen v. U.S. Dep't of Health & Human Servs., 975 F. Supp. 2d 81, 97 (D.D.C. 2013) (internal quotations and citations omitted).  "[W]hen leads to other documents arise during the course of a search for responsive records, the agency must expand the scope of its search."  Id.  In the instant case, Dr. Johnson is not merely speculating about the existence of responsive documents outside of OPA, she has reliable evidence that their existence is likely.  In light of those references, it was

unreasonable for the Agency to draw the conclusion, without providing more of an explanation, that OPA would be "the only Agency office reasonably likely to possess records responsive to Plaintiff's request."  Shiner Decl. ¶ 9.

The only one of the unsearched offices to be directly addressed in the Agency's Affidavit was the PRB.  In support of its position that PRB records did not have to be searched, the Agency declared that:

> the [PRB] is the CIA's office charged with reviewing materials produced by CIA personnel ... intended for publication in any form in order to determine whether the proposed materials contain classified information.  The purpose of prepublication review is to ensure that classified information, damaging to the national security[,] is not inadvertently disclosed.  The PRB is not charged with providing guidance to CIA personnel regarding the use of any particular media.

Id. ¶ 14.  Even given these facts, however, if the PRB is tasked with reviewing Twitter content, whether for classification or other purposes, it is likely that the PRB has "documents or materials . . . used to instruct or train agency personnel in the use of the agency's public-facing Twitter account, *@CIA*."  FOIA Request No. 2.  There is at least enough of a possibility so that the Agency had the duty to expand its search once its search team realized PRB's involvement.

In sum, the mention of PRB and other offices in the produced documents are leads sufficient to require the Agency to expand the scope of its search.  The Agency was unreasonable in declining to look for documents related to the second request in the OGC, the CIO, the Web Council, and the PRB.

<u>Exclusion of Communications and Drafts</u>

Dr. Johnson also objects to the scope of the search for documents responsive to the second request on the grounds that the Agency was unreasonable in not producing communications and previous drafts of documents regarding the Twitter account.  Specifically, Dr. Johnson points to the fact that communications between the OPA and ex-CIA Director John Brennan relating to the first post to the Twitter account were not produced, and that messages and responses from listservs discussing social media use, intra-agency communications between personnel responsible for social media, and earlier drafts of produced documents were not produced either.  Pl. Opp. at 9-11.  However, these documents are beyond the scope of the FOIA Request and do not need to be produced.

An agency "has a duty to construe a FOIA request liberally."  <u>Nation Magazine</u>, 71 F.3d at 890.  However, an agency is also "not required to search for records beyond the scope of the request."  <u>Voinche v. FBI</u>, Nos. 96-5304, 95CV01944, 1997 WL 411685, at *1 (D.C. Cir. 1997).  Dr. Johnson's second request seeks "any documents or materials, including but not limited to, guides, manuals, handbooks, policies, or presentations used to instruct or train agency personnel . . . ."  FOIA Request at 1.  This is in contrast to the broader language Dr. Johnson uses in her first request, which seeks "electronic or written communication, including emails and email attachments . . . ."  <u>Id.</u>

The Agency was reasonable in limiting the search under the second request to only formal Agency documents used to instruct or train Agency staff with regard to the Twitter account.  The clear terms of the request seek only those pedagogical documents and not every

informal communication or draft document discussing the use of the Twitter account.  The

Agency was reasonable in limiting its search to respond to the request as submitted.

### Objection to Response to Third Request

Dr. Johnson's third request asks for "[t]he list of user applications connected to the CIA's

public-facing Twitter account, *@CIA* . . . ."  FOIA Request No. 3.  Dr. Johnson provided the

Agency with step by step directions on where to find this record on its Twitter account.  Id.  The

Agency, instead of following those directions, conducted a search within the OPA records that

returned a result of "No Records Located."  Supp. Shiner Decl. ¶ 5.  The Agency ended its search

there, refusing to follow the instructions provided by Dr. Johnson and reasoning that FOIA does

not obligate it to create records.  Def. Mem. (Docket No. 24) at 8.  This Court rules that the

Agency's search related to the third request was inadequate because it failed to follow Dr.

Johnson's instructions, which would allow the Agency to locate, not create, the responsive

record.

The FOIA "does not obligate agencies to create or retain documents; it only obligates

them to provide access to those which it in fact has created and retained."  Kissinger v.

Reporters Comm. for Freedom of the Press, 445 U.S. 136, 152, 100 S. Ct. 960, 969, 63 L. Ed. 2d

267 (1980).  In National Security Counselors v. CIA, the court distinguished between producing

records and files stored electronically, on one hand, and creating a "listing or index of records"

on the other.  898 F. Supp. 2d 233, 271 (D.D.C. 2012).  As that court explained:

> an agency need not create a new database or [] reorganize its method of
> archiving data, but if the agency already stores records in an electronic
> database, searching that database does not involve the creation of a new
> record.  Likewise, sorting a pre-existing database of information to make
> information intelligible does not involve the creation of a new record

because, as Congress noted in the legislative history to the E-FOIA Amend-
ments, "[c]omputer records found in a database rather than a file cabinet
may require the application of codes or some form of programming to
retrieve the information."

Id. at 270 (quoting H.R. Rep. 104-795, at 22, 1996 U.S.C.C.A.N. 3448, 3465).  The court differ-

entiated document searches from the creation of documents by ruling that "a FOIA request for

a listing or index of a database's contents that does not seek the contents of the database, but

instead essentially seeks information about those contents, is a request that requires the

creation of a new record, insofar as the agency has not previously created and retained such a

listing or index."  Id. at 271.  Thus, while an agency is not compelled to create a new list for a

requester, searching for a list that already exists is discoverable through FOIA.

The list sought by Dr. Johnson in the third request already exists and must be produced.

She is not asking the Agency to create a list of user applications, but rather seeks the currently

existing list of user applications available on Twitter's website.

As evidenced by Exhibit O to the Sellars Declaration (Docket No. 28-16), the record

sought is a list, accessible to the Agency, already maintained on the Agency's Twitter account.

The record exists with regard to all Twitter accounts and would not be created specifically for

purposes of the Agency's FOIA response.

The Agency is required to search for and produce the record even though it is hosted on

Twitter's website because the Agency has sufficient control over the document.  "In order to be

considered agency records, the requested materials must be under agency control at the time

the FOIA request is made."  Reich v. U.S. Dep't of Energy, 811 F. Supp. 2d 542, 545 (D. Mass.

2011).  "Federal Courts have looked at four factors to assess whether an agency exercises

sufficient control over records: (1) the intent of the document's creator to retain or relinquish

[18]

control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files."  Id. The balance of the factors leads to the conclusion that the Agency has sufficient control over the applications page sought.  As evidenced by Exhibit O to the Sellars Declaration, the Agency can manipulate its applications list by revoking access to certain applications and connecting to others.  The makeup of this list is controlled by the Agency's own decisions with regard to its Twitter account.  This shows that Twitter has significantly relinquished control over this page to the Agency.  Even if not hosted within the Agency's records system, the Agency has enough ability to manipulate and use the record so that the list constitutes an Agency-controlled record for FOIA purposes.  The list must therefore be produced.  The Agency's search related to the third request was inadequate.

### Summary

For the reasons detailed herein, summary judgment is denied.  The parties are ordered to meet and confer with regard to additional searches and/or affidavits in compliance with the rulings herein.

### C.   Application of FOIA Exemptions (b)(3), (b)(5) and (b)(6)

The Agency has withheld portions of the production under three FOIA exemptions. Within FOIA, "Congress provided a number of exemptions that permit an agency to withhold certain documents from release.  To fulfill the broad purposes of FOIA, we construe these exemptions narrowly."  Stalcup, 768 F.3d at 69 (citing FBI v. Abramson, 456 U.S. 615, 630, 102 S. Ct. 2054, 72 L. Ed. 2d 376 (1982)).  "The policy underlying FOIA is . . . one of broad disclosure,

and the government must supply any information requested by any individual unless it deter-

mines that a specific exemption, narrowly construed, applies." <u>Church of Scientology Int'l</u>, 30

F.3d at 228.  The Agency bears the burden of proving that any claimed exemption applies.  <u>Id.</u>

"The government's burden is a light one . . . an agency's justification for invoking a FOIA exemp-

tion is sufficient if it appears logical or plausible." <u>Katsiaficas v. CIA</u>, No. 13-cv-11058-ADB, 2017

WL 2172437, at *5 (D. Mass. May 17, 2017) (internal quotations and citation omitted).

The Agency has provided the Court with explanations for its withholdings by way of both

the Shiner Declaration and the Vaughn Index.  The Court must reject the Agency's withholdings

if "the declarations do not demonstrate careful analysis of each document by the government;

the court has not been assisted in its duty of ruling on the applicability of an exemption; and

the adversary system has not been visibly strengthened." <u>Church of Scientology Int'l</u>, 30 F.3d at

231.

The government has withheld information under Exemptions (b)(3), (b)(5), and (b)(6).

For the reasons detailed herein, the Agency has met its burden of withholding information

under Exemption (b)(3), but has failed to justify its withholding under Exemption (b)(5) and

Exemption (b)(6).

### Exemption (b)(3)

Exemption (b)(3) provides that disclosure under FOIA is not mandated where

information is "specifically exempted from disclosure by statute . . . if that statute – [] requires

that the matters be withheld from the public in such a manner as to leave no discretion on the

issue; or [] establishes particular criteria for withholding or refers to particular types of matters

to be withheld[.]"  The Agency claims that Exemption (b)(3) allows for the withholding of

certain information under both the CIA Act, 50 U.S.C. § 3507, and the National Security Act, 50 U.S.C. § 3024.

The National Security Act provides in part that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  The Agency has redacted information pursuant to the National Security Act in order "to protect information about intelligence sources and methods – including guidance regarding security and counter intelligence threats[.]"  Vaughn Index.

The CIA Act provides in part that "the Agency shall be exempted from the provisions of . . . [any] law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries or numbers of personnel employed by the Agency[.]"  50 U.S.C. § 3507.  The Agency has invoked the CIA Act here to withhold disclosure of "the organization and function of offices within the agency," "identifying information of CIA personnel," and "the internal structure and detailed functions of CIA offices."  Vaughn Index.

In determining whether an agency has properly redacted information under Exemption (b)(3), the Court asks two questions.  "First, does the statute constitute a statutory exemption to disclosure within the meaning of Exemption 3?  Second, is the requested information included within the statute's protection?"  Maynard, 986 F.2d at 554 (internal quotations and citation omitted).  The First Circuit in Maynard, held that "once a court determines that the statute in question is an Exemption 3 statute, and that the information requested at least arguably falls within the statute, FOIA de novo review normally ends."  Id. (quoting  Aronson v. IRS, 973 F.2d 962, 965, 967 (1st Cir. 1992)).  The reasoning for such a procedure is that "in determining whether withheld material relates to intelligence sources or methods, a court must

accord substantial weight and due consideration to the CIA's affidavits." Id. at 555 (internal

quotations and citation omitted).

Both the National Security Act and the CIA Act have been identified as withholding

statutes for purposes of Exemption (b)(3). CIA v. Sims, 471 U.S. 159, 167-68, 105 S. Ct. 1881,

1887, 85 L. Ed. 2d 173 (1985); Baker v. CIA, 425 F. Supp. 633, 634 (D.D.C. 1977).  This completes

the analysis for step one of the Maynard test.  For step two, in determining whether the infor-

mation falls within the statute, the Agency has provided the Court with insight into its rationale

for withholding certain information.  It states that "the information would reveal specific

sources and methods of the Agency, including techniques used to protect information systems,

guidance regarding counter intelligence threats, and the Agency's agreements with social

media providers."  Shiner Decl. ¶ 17.  The Court has no basis to doubt the Agency's declaration

which, if true, would place the redacted information squarely within the protections offered by

the CIA Act and the National Security Act.

Dr. Johnson argues that the exemptions should be waived with regard to employee

information that has previously been disclosed to the public.  Dr. Johnson cites to N.Y. Times

Co. v. U.S. Dep't of Justice, which holds that "[v]oluntary disclosures of all or part of a document

may waive an otherwise valid FOIA exemption."  756 F.3d 100, 114 (2d Cir. 2014) (internal

quotations and citation omitted).  However, in order for the Court to establish waiver of

Exemption (b)(3) protection, the requester must point to a disclosure which "precisely track[s]

the records sought to be released."  Assassination Archives & Research Ctr. v. CIA, 334 F.3d 55,

60 (D.D.C. 2003).  Dr. Johnson fails to meet that burden here.  She argues that the withholdings

"are inappropriate to the extent that they withhold the names of Web Content Manager

Carolyn Reams and other publicly-known OPA staff, as the agency has voluntarily identified those persons in public events and presentations, and thus waived their ability to now claim protection from re-revealing their identities."  Pl. Opp. at 16.  It is not the Agency's burden to establish which identities have or have not been disclosed elsewhere.  It is only where the requester can show that the precise information released in another context duplicates what is being withheld, that Exemption (b)(3) has been waived.  Dr. Johnson's speculation that there are names generally withheld here that have been disclosed in other venues is insufficient.

The Agency's redactions under Exemption (b)(3) reflect strategic security decisions made by the Agency that it has supported through the Shiner Declaration and the Vaughn Index.  The Agency has carried its burden of justifying its Exemption (b)(3) withholdings.

### Exemption (b)(5)

Exemption (b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]"  Exemption (b)(5) "exempt[s] those documents, and only those documents, normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149, 95 S. Ct. 1504, 1515-16, 44 L. Ed. 2d 29 (1975).  The Agency has redacted one document under Exemption (b)(5), claiming that it cannot be disclosed under the deliberative process privilege.  See Sellars Decl. at Ex. B (Docket No. 28-3).  The Agency claims to have redacted document C06468167 "to protect pre-decisional intra-agency deliberations of the risks and benefits of certain activities on social media, and the decision making process."  Vaughn Index.

In claiming the deliberative process privilege, "[t]he government carries the burden of establishing the applicability of the exemption and must show: (1) that the withheld material is

[23]

an inter- or intra- agency memorandum . . . (2) that the document is deliberative; and (3) that it is predecisional." Stalcup, 768 F.3d at 70 (citing Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 557 (1st Cir. 1992). "To satisfy the 'deliberative' element of the exception, a document must reflect 'the give-and-take of the consultative process.'" Id. (quoting Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992). "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." Providence Journal Co., 981 F.2d at 559 (internal quotations and citations omitted).

The Agency asserts that it "invoked the deliberative process privilege over information that is pre-decisional and deliberative in nature because it provides information for Agency employees to consider prior to making a decision whether to engage in certain activities on social media. It provides employees with information about the risks and benefits of certain activities on social media, and is intended to inform their decision-making process." Shiner Decl. ¶ 20. The Agency misapplies the privilege. As the Agency describes, the information withheld is part of an Agency document used to aid employees in making decisions related to the Twitter account. Although it may aid the deliberative process, the document itself is not actually deliberative. It does not reflect "the give-and-take of the consultative process." Stalcup, 768 F.3d at 70 (internal quotations and citation omitted). Therefore, the redactions are not subject to the deliberative process privilege and cannot be withheld pursuant to Exemption (b)(5). The Agency has failed to carry its burden with regard to this exemption.

[24]

**Exemption (b)(6)**

Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" The Agency explains that in applying Exemption (b)(6), "an agency is required to balance the relevant privacy interests of the individuals against the public interest in disclosure." Shiner Decl. ¶ 21. The Agency applies the exemption to emails between Agency employees and Twitter employees, and specifically redacts "the names, email addresses, and job titles of CIA and Twitter employees in these communications." Id. ¶ 22. The Agency states that disclosure "will not shed light on the conduct of the Agency's activities or operations beyond what is already being disclosed to the public through the release in part of these records." Id. "In contrast, [the Agency states that] the release of the names and other identifying information would be reasonably likely to subject those individuals or those associated with them to increased harassment or threat as employees of the CIA or of Twitter." Id.

Whether names and other identifying information are appropriately withheld under Exemption (b)(6) is a two-part analysis. Families for Freedom v. U.S. Customs & Border Protection, 837 F. Supp. 2d 287, 301 (S.D.N.Y. 2011). "First, we must determine whether the personal information is contained in a file similar to a medical or personnel file . . . [second,] we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a clearly unwarranted invasion of personal privacy." Id. (quoting Wood v. FBI, 432 F.3d 78, 86 (2d Cir. 2005)).

The term "similar files" in Exemption (b)(6) is meant to "have a broad, rather than a narrow, meaning." U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 600, 102 S. Ct.

1957, 1960-61, 72 L. Ed. 2d 358 (1982).  The exemption is not intended to apply "to a narrow class of files containing only a discrete kind of personal information.  Rather, the exemption was intended to cover detailed Government records on an individual which can be identified as applying to that individual."  Id. at 602, 102 S. Ct. at 1961 (internal quotations and citations omitted).  "When disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy."  Id. at 602, 102 S. Ct. at 1261-62.

In the instant case, Exemption (b)(6) is not applicable.  The "emails can in no way be construed as similar to personnel or medical files" so the Exemption cannot be invoked. Families for Freedom, 837 F. Supp. 2d at 301; see also Friedman v. U.S. Secret Serv., 923 F. Supp. 2d 262, 281-82 (D.D.C. 2013), and cases cited; Washington Post Co., 456 U.S. at 602 n.4, 102 S. Ct. at 1962 n.4 (recognizing the need to meet the "threshold requirement that information be contained in personnel, medical, and similar files").  Rather, the emails are "mundane interoffice communications [and] do not contain any detailed personal information."  Families for Freedom, 837 F. Supp. 2d at 301.  Since the emails do not qualify for this exemption, there is no need to address the second prong of the analysis.  Id.[6]  The information should not have been redacted.

---

[6]  Even if Exemption (b)(6) were to apply, the Agency applied it too broadly.  For example, but without limitation, there is no basis to withhold job titles from the production.  See News Group Boston, Inc. v. Nat'l R.R. Passenger Corp., 799 F. Supp. 1264, 1272 (D. Mass. 1992) (names and home addresses may be redacted from production of payroll records but job titles must be produced).  Similarly, depending on the form of the email address, it may be difficult for the Agency to claim that its disclosure would constitute an unwarranted invasion of privacy.

## IV.  <u>**CONCLUSION**</u>

For all the reasons detailed herein, the Agency's Motion for Summary Judgment (Docket No. 23) is DENIED.  The parties are directed to meet and confer regarding future searches, affidavits and productions in accordance with the rulings herein.  The parties shall file a joint status report within 21 days of the date of this Order.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge