# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

AMANDA JOHNSON,

                        Plaintiff,

v.                                                    Case No. 17-cv-10789-JGD

CENTRAL INTELLIGENCE AGENCY

                        Defendant.

## <u>MEMORANDUM IN SUPPORT OF</u>
## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 4

ARGUMENT ......................................................................................................... 7

I.    The Agency Has Not Established that It Conducted a Reasonable Search of the Information Management Services. ........................................................................ 8

    A.    The Agency's Declaration Is Inadequate, Because It Does Not Describe IMS File Systems or Demonstrate that All File Systems Likely to Contain Responsive Records Were Searched. ........................................................................................... 10

    B.    The Agency's Declaration Is Inadequate, Because It Fails to Explain How Search Terms Were Combined to Identify Responsive Records................................................. 12

II.    OPA Employees Used Their Personal Email Accounts to Communicate with Twitter. Those Personal Accounts Must Be Searched........................................................ 14

III.    Recently Produced Records Demonstrate that the Office of the Director of the CIA Participated in the Strategy and Management of the @CIA Twitter Account. This Office Must Therefore Be Searched. ................................................................................ 16

IV.    The Agency Must Release Segregable Information In Record C06779112................. 18

CONCLUSION..................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*ACLU Found. of Mass. v. FBI*, No. 14-cv-11759,
2016 WL 4411492 (D. Mass. Aug. 17, 2016) ........................................................ 3, 15, 17–18

*ACLU of Mass., Inc. v. ICE*, --- F. Supp. 3d ---, No. 19-cv-10690,
2020 WL 1429882 (D. Mass. Mar. 24, 2020).............................................................. 1, 7, 10

*Brennan Ctr. for Justice v. Dep't of Justice*, 377 F. Supp. 3d 428 (S.D.N.Y. 2019)................... 16

*Carpenter v. Dep't of Justice*, 470 F.3d 434 (1st Cir. 2006) ........................................................ 8

*Church of Scientology Int'l v. Dep't of Justice*, 30 F.3d 224 (1st Cir. 1994) ...................... passim

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*,
827 F.3d 145 (D.C. Cir. 2016).................................................................................. 3, 14, 16

*Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ............ 7, 19–20

*Families for Freedom v. Customs & Border Prot.*, 837 F. Supp. 2d 331 (S.D.N.Y. 2011) ......... 12

*Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220 (D.D.C. 2017)........................................ 15

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770 (D.C. Cir. 2018) .......................... 4

*Knight First Amendment Inst. at Columbia Univ. v. Dep't of Homeland Security*,
407 F. Supp. 3d 311 (S.D.N.Y. 2019) ................................................................................ 13

*Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).......... 19

*Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993) ................................................................. 8, 10, 20

*Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977).............................. 19

*Mone v. Dep't of Navy*, 353 F. Supp. 2d 193, 196 (D. Mass. 2005)............................................ 20

*Nat'l Day Laborer Org. Network v. ICE*, 877 F. Supp. 2d 87 (S.D.N.Y. 2012) ................... 12, 14

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101 (D.D.C. 2013)............................................ 11

*Nat'l Sec. Counselors v. CIA*, 206 F. Supp. 3d 241 (D.D.C. 2016) ............................................ 11

*Peck v. City of Boston*, 750 F. Supp. 2d 308 (D. Mass. 2010)...................................................... 7

*Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373 (D.D.C. 2018) ........................................ 8

*Sephton v. FBI*, 365 F. Supp. 2d 91 (D. Mass. 2005) ................................................... 10

*Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014)................................................................. 11

*Stalcup v. Dep't of Defense*, No. 13-cv-11967, 2018 WL 4963169 (D. Mass. Oct. 15, 2018) .... 11

*Stalcup v. Dep't of Defense*, No. 16-1225, slip op.
(1st Cir. Jan. 3, 2018) (per curiam, unpublished) ................................................. 8, 11

*Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241 (D.D.C. 2017)........................................... 8

*Windham v. Dep't of Hous. & Urban Dev.*, 140 F. Supp. 3d 163 (D. Mass. 2015) .................... 15

**Statutes**

5 U.S.C. § 552.................................................................................................... 4, 18–19

50 U.S.C. § 3024................................................................................................ 4, 18, 19

## INTRODUCTION

For over three years, this standard Freedom of Information Act ("FOIA") has been on this Court's docket. What has kept it there has been Defendant Central Intelligence Agency's pattern of doing as little as they can to process Plaintiff Dr. Amanda Johnson's Freedom of Information Act request, all while claiming that they have gone above and beyond in their responsibilities. This has forced Dr. Johnson to repeatedly demonstrate that they have not satisfied their burden under FOIA. Indeed, Defendant has not performed to its standard from other FOIA cases.

In response to a FOIA request seeking broad sets of information about Defendant's operation of its social media account, Defendant originally produced fewer than twenty records, necessitating this Court's first intervention. Mem. of Decision & Order on Def.'s Mot. Summ. J. at 3–4, 27 ("First SJ Order"), ECF No. 52. Its subsequent performance has required Plaintiff to send numerous detailed letters over a series of months identifying the many glaring errors in its performance. Second Decl. of Andrew F. Sellars ("Second Sellars Decl.") Exs. F, G. This included debates over, among other issues, whether a document needed to be produced so that the Plaintiff could read it—a dispute requiring the Court's intervention once again. Second Sellars Decl. ¶¶ 13–14.

Plaintiff again seeks this Court's intervention to ensure Defendant fulfill Congress' "general philosophy of full agency disclosure" and high standards for withholding of information. *ACLU of Mass., Inc. v. ICE*, --- F. Supp. 3d ---, No. 19-cv-10690, 2020 WL 1429882, at \*4 (D. Mass. Mar. 24, 2020) (citation omitted). Defendant falls short in four specific areas.

First, the Agency refuses to adequately explain its search of the CIA's Information Management Services ("IMS"), in particular its search for information related to the pre-publication review of content for the *@CIA* Twitter account, a process mentioned in Defendant's

1

Standard Operating Procedures for social media content and for which Plaintiff first noted the absence of related records in October 2017. *See* Decl. of Andrew F. Sellars ("First Sellars Decl.") Ex. F, at 2–4, ECF No. 28-7. Defendant initially stated that this document referenced a process conducted by the Publications Review Board ("PRB"), Shiner Decl. ¶ 14, ECF No. 24-1, and on that basis this Court ordered a search of the PRB, First SJ Order 14–15. Defendant now claims that it is the IMS, and not the PRB, that holds the referenced records. Second Sellars Decl. Ex. J ¶ 14. But Defendant also claims that a search directed to records used in the course of this pre-publication review process is not necessary, because IMS was previously searched for a different part of the request. *Id.* It is impossible to know if Defendant is correct, as the Agency fails to describe the structure of the IMS record systems or how it utilized search terms to conduct its prior search. This Court and the Plaintiff thus have no way to know if the search was targeted to reveal the records in question, as Defendant fails to provide enough information "to enable the adversary process to operate" around the adequacy of the search. *Church of Scientology Int'l v. Dep't of Justice*, 30 F.3d 224, 233 (1st Cir. 1994). Defendant must provide a more detailed declaration as to the search of the IMS.

Second, Defendant once again refuses to acknowledge the need to expand its search "when leads to other documents arise during the course of a search for responsive records." First SJ Order 14 (quoting *Pub. Citizen v. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 97 (D.D.C. 2013)). Specifically, records produced after the last summary judgment briefing now reveal that the staff at the CIA's Office of Public Affairs ("OPA") used their personal email accounts to correspond with staff at Twitter. Second Sellars Decl. Ex. E; *see id.* Ex. A, at 2, 4, 5. Any emails of this nature are responsive to the first part of Plaintiff's FOIA request, seeking communications between OPA and Twitter about the @*CIA* account. Compl. Ex. A, ECF No. 1-

2

1. That they are held in OPA staff's personal email accounts does not obviate Defendant's obligation to search for and produce those records. *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 150 (D.C. Cir. 2016). The Agency must search the personal email accounts of relevant OPA staff for responsive records.

Third, recently produced records make clear that the Office of the Director of the CIA ("ODCIA") is, in fact, likely to possess "documents or materials, including but not limited to . . . presentations used to instruct or train agency personnel in the use of [the *@CIA* Twitter account]." Compl. Ex. A, ECF No. 1-1. Plaintiff previously produced evidence showing informal discussions between OPA staff and the CIA Director, *see* First SJ Order 16, and newly-produced records reveal far more substantial involvement. Defendant has now produced numerous records describing multiple presentations and discussions between OPA, ODCIA, and Twitter staff, including a formal presentation to then-Director John Brennan. Second Sellars Decl. Ex. B, at 36. At this presentation Director Brennan appears to have provided direction spanning from particular content ideas to the overall public engagement strategy for the *@CIA* account. *Id.* at 21–23 (notes from a conversation apparently including OPA, ODCIA, and Twitter staff). All such presentations and any other documents or materials related thereto are "documents or materials, including . . . presentations used to instruct or train agency personnel" in the use of the account. *See* Compl. Ex. A, ECF No. 1-1. As either the originator or recipient of these responsive records, ODCIA personnel likely possess them. *See ACLU Found. of Mass. v. FBI*, No. 14-cv-11759, 2016 WL 4411492, at *8 (D. Mass. Aug. 17, 2016). The records of ODCIA must therefore be searched.

Fourth, Defendant fails to fully justify a lengthy redaction it made under FOIA Exemption (b)(3) of an email discussion between OPA and Twitter staff about two problematic Twitter

accounts, in the record that Defendant has labeled C06779112 (the "'9112 Record"). Second

Sellars Decl. Ex. C. The first account is alleged to be harassing the Agency and the second is

alleged to be a "brand impersonation" of the Agency. *Id.* Defendant presently defends only its

redaction of information about the harassing account, ignoring the brand impersonation account

entirely. *See* Second Sellars Decl. Ex. J ¶ 22. Defendant must either explain why releasing

discussion of the brand impersonation account would constitute revealing "intelligence sources

and methods" under the National Security Act, 50 U.S.C. § 3024(i)(1), *see* First SJ Order 21, or

release the portions of the record that discuss the "brand impersonation" account. 5 U.S.C.

§ 552(a)(8)(A)(ii)(II); *see Church of Scientology Int'l*, 30 F.3d at 231.

Plaintiff first raised these concerns to Defendant well more than one year ago—save for the

issues regarding the search of IMS, which Defendant only revealed in December 2019. *See*

Second Sellars Decl. ¶ 14; *id.* Ex. F. "[A]gency 'good faith effort and due diligence' are the

touchstones underlying FOIA's statutory scheme," and agencies should adhere to the obligations

of the FOIA "without routine judicial involvement." *Judicial Watch, Inc. v. Dep't of Homeland

Sec.*, 895 F.3d 770, 783 (D.C. Cir. 2018) (citation omitted). As Defendant has not done so, Dr.

Johnson asks that the Court grant her Motion for Summary Judgment.

## STATEMENT OF FACTS

1.  On or about December 19, 2014, Dr. Johnson submitted a FOIA request seeking three sets of

    records related to the Agency's Twitter account. Compl. Ex. A, ECF No. 1-1.

2.  After this action was filed in May 2017, the Agency conducted a search and produced

    eighteen records. Joint Status Report at 2, ECF No. 19. On October 25, 2017, Plaintiff raised

    several concerns with the Agency's production, including in relevant part for this motion, the

absence of any records related to the pre-publication review referenced in the OPA's Standard Operating Procedures. Pl.'s Mot. Summ. J. Ex. F, at 8, ECF No. 28-7.

3. On January 23, 2018, Defendant moved for summary judgment. In support of its motion, the Agency submitted a declaration that identified the PRB as the office tasked the review mentioned in Plaintiff's October 2017 email. Shiner Decl. ¶ 14, ECF No. 24-1.

4. On September 17, 2018, this Court denied the Agency's Motion for Summary Judgment. First SJ Order 27. In relevant part for the present motion, the Court ordered the Agency to search the office "tasked with reviewing Twitter content," then believed to be the PRB, and the files of the Chief Information Officer ("CIO"). *Id.* at 15.

5. Plaintiff received about 305 records on January 4, 2019. Joint Status Report 2, ECF No. 62.

6. On March 13, 2019, Plaintiff sent Defendant a memorandum identifying several issues arising from the Agency's January production, including in relevant part (1) the absence of any records from the PRB, (2) an incomplete email chain involving a personal email account on Google's Gmail service that appeared to be used by an OPA employee, (3) new documents showing that responsive records were likely located in ODCIA, and (4) unexplained redactions in the '9112 Record. Second Sellars Decl. Ex. F, at 4–6.

7. On April 22, 2019, Defendant produced a *Vaughn* index describing the redactions in the January 2019 records. Joint Status Report 2, ECF No. 62. On May 3, 2019, the Agency produced a description of its search, which made clear that only the official agency email accounts of OPA staff were searched, and not their personal email accounts. Second Sellars Decl. ¶ 7; *see id.* Ex. J. ¶¶ 10–13. Defendant produced about 84 additional records on May 31, 2019. Joint Status Report 2, ECF No. 62.

8.  On June 21, 2019, Plaintiff sent Defendant a second memorandum that articulated her
    ongoing concerns. In relevant part, Plaintiff (1) noted again the absence of records related to
    the PRB, despite the (then-believed) role that PRB had in approving content for the @*CIA*
    Twitter account; (2) demonstrated the need to search the personal email accounts of OPA
    staff; (3) demonstrated the need to search of ODCIA given the more recent records; and (4)
    explained why the justification for the redactions in the '9112 Record was inadequate.
    Second Sellars Decl. Ex. G.

9.  On July 30, 2019, Defendant stated that—contrary to its prior briefing—the PRB plays no
    role in approval of proposed @*CIA* Twitter content specified by the Standard Operating
    Procedures, but did not reveal what office performed this review, even though the Court
    ordered to Defendant to search the office that conducted this review. Second Sellars Decl.
    Ex. I, at 2.

10. Between July and December of 2019, Plaintiff attempted several times to resolve these
    outstanding issues by, among other things, requesting evidence that the personal emails of
    OPA staff would not contain new records, asking for an explanation of the discrepancy
    around the PRB, and seeking clarification of the redactions in the '9112 Record. Second
    Sellars Decl. ¶¶ 11–14. Defendant never adequately responded to these issues.

11. During a status conference in December 6, 2019, the Agency finally advised that documents
    related to review of Twitter content are maintained by IMS, instead of the PRB. Second
    Sellars Decl. ¶¶ 13–14.

12. On March 17, 2020, in anticipation of the present briefing, Defendant provided a draft
    declaration from Defendant's Information Review Officer Vanna Blaine. In this declaration,
    Defendant (1) provides minimal information about its search of IMS; (2) admits that an OPA

6

employee "used her personal address to conduct official business," but states (without substantiation) that "all emails she sent or received on this topic would ultimately be captured by her official address;" (3) reiterates its refusal to conduct a search of ODCIA; and (4) repeats its prior incomplete justification for redactions in the '9112 Record. Second Sellars Decl. Ex. J ¶¶ 13, 16–22. Defendant stated that it did not anticipate material changes to this draft before the present briefing. Second Sellars Decl. ¶ 16.

## ARGUMENT

The Agency's refusal to conduct a reasonable search for responsive records, describe its searches adequately, and release all segregable information shows that it has not "fully discharged its obligations under the FOIA." First SJ Order 7 (quoting *Moffat v. Dep't of Justice*, No. 09-cv-12067, 2011 WL 3475440, at *1 (D. Mass. Aug. 5, 2011)). "FOIA expressly places the burden on the agency to sustain its action and directs the district courts to determine the matter de novo." *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (citation omitted). "'This burden does not shift even when,' as here, 'the requester files a cross-motion for summary judgment.'" *ACLU of Mass., Inc.*, 2020 WL 1429882 at *5 (quoting *Prop. of the People, Inc. v. OMB*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018)). With cross-motions for summary judgment, the Court "must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Peck v. City of Boston*, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (citation omitted).

To sustain its burden, the Agency must, among other things, provide "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials were searched, as well as a general description of the structure of the agency's file system demonstrating why further search would be overly

burdensome." *Maynard v. CIA*, 986 F.2d 547, 563 (1st Cir. 1993) (citation omitted). Defendant

also "bears the burden of proving that withheld materials fall within one of the statutory

exemptions." *Carpenter v. Dep't of Justice*, 470 F.3d 434, 438 (1st Cir. 2006); *see Prop. of the*

*People, Inc.*, 330 F. Supp. 3d at 380 (agency "has the onus of proving that the documents are

exempt from disclosure, while the burden upon the requester is merely to establish the absence of

material factual issues") (citation omitted).

## I.   The Agency Has Not Established that It Conducted a Reasonable Search of the Information Management Services.

The Agency's statements describing its search of IMS are inadequate because they do not

"denote which files were searched, or by whom, do not reflect any systematic approach to

document location, and do not provide information specific enough to enable [the requester] to

challenge the procedures utilized." *Urban Air Initiative, Inc. v. EPA,* 271 F. Supp. 3d 241, 253

(D.D.C. 2017) (quoting *Weisberg v. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980)). Its

explanation precludes this Court from determining whether the search was "reasonably

calculated to uncover all relevant documents." First SJ Order 8 (internal quotation omitted); *see*

*also Stalcup v. Dep't of Defense*, No. 16-1225, slip op. at 4 (1st Cir. Jan. 3, 2018) (per curiam,

unpublished).[1] Because the Agency has failed to provide the necessary description of IMS'

records systems and the method it used to search IMS, the Agency has not met its burden to

show that it conducted an adequate search. *Maynard*, 986 F.2d at 559–60.

Searches of the IMS are now relevant to this litigation twice over. In its last order on

summary judgment, this Court ordered a search of the CIO's files, which are maintained by IMS.

First SJ Order 15. Second, the Court ordered a search of the office "tasked with reviewing

---

[1] A copy of this Judgment is appended. Second Sellars Decl. Ex. M.

Twitter content" pursuant to the Standard Operating Procedures. *Id*. Plaintiff and the Court previously relied on the Defendant's representation that this office was the PRB, but Defendant now claims it is the IMS. As this Court previously noted, if the department "is tasked with reviewing Twitter content, it is likely to have records responsive to the second part of Dr. Johnson's request. *Id.*

A detailed declaration is required to ensure the search is subject to the adversarial process that the FOIA requires. *Church of Scientology Int'l*, 30 F.3d at 233. It is especially important here, because the Agency appears to adopt an overly cramped reading of the second part of Plaintiff's FOIA request, against its obligation to construe requests liberally. First SJ Order 16. In its draft declaration, the Agency states (without detail) that it narrowed Dr. Johnson's request to only "guides, manuals, or policies *specific to* the Agency's use of Twitter." Second Sellars Decl. Ex. J ¶ 17. (emphasis added). Of course, "documents or materials . . . used to instruct or train agency personnel in the use" of the Twitter account need not be *specific to* Twitter. Compl. Ex. A, ECF 1-1. The officers conducting this content review may follow guidance that applies to all social media posts, all Internet content, or all Agency publications in general. Any such documents would be responsive to Plaintiff's second request if they are referenced when approving @*CIA* content, and the search may have avoided discovering such documents. Absent detail, neither the Plaintiff nor this Court can know for sure.

Defendant's primary description of its search is, in relevant part:

> Consistent with the Court's order, the CIA conducted searches in [the Office of General Counsel, the Office of the CIO, the Office of Public Affairs Web Council, and the Prepublication Review Board] for material responsive to Count Two, including searches designed to capture internal files (including hard copy files), share drive files, and emails relevant to each. For each of the relevant records systems, search personnel ran a number of terms including "Twitter," "guides," "manuals," "policies," "OPA," etc.

9

Second Sellars Decl. Ex. J ¶ 15. The Agency's search did not uncover any responsive records. *Id.*

at ¶ 17. Unlike in its prior declaration in this case, this declaration does not identify the most

likely places in the Agency to have responsive documents, explain why file systems searched

were "sufficient . . . to locate all responsive documents to Dr. Johnson's requests," or describe

how the Agency combined its search terms or otherwise "narrow[ed] the search to obtain more

responsive, and fewer irrelevant, documents." First SJ Order 10.

### A. The Agency's Declaration Is Inadequate, Because It Does Not Describe IMS File Systems or Demonstrate that All File Systems Likely to Contain Responsive Records Were Searched.

The First Circuit requires an agency to describe, *inter alia*, the structure of its file system as

part of affidavits supporting a search. *Maynard*, 986 F.2d at 559–60; *see Sephton v. FBI*,

365 F. Supp. 2d 91, 97-100 (D. Mass. 2005), *aff'd* 442 F.3d 27, 29 (1st Cir. 2006) (describing an

agency's hierarchy of files, subfiles, and subdivisions); *ACLU of Mass., Inc.*, 2020 WL 1429882

at *11 (detailed description of locations of the information, methods of storage, and types of data

enabled court to find "disconnect" between search method and record location). Such a

description must "aver[] that all files likely to contain responsive materials . . . were searched."

*Maynard*, 986 F.2d at 563 (citation omitted).

Here, the Defendant fails to acknowledge the existence of record systems within IMS, much

less describe their file structure and contents. The Agency states only that it searched some form

of "internal files (including hard copy files), share drive files, and emails relevant" to the four

departments named in the Court's Order. Second Sellars Decl. Ex. J ¶ 15. The IMS is not one of

the four departments named, but the Agency adds that "the search for information within CIO

already included IMS's files." Second Sellars Decl. Ex. J ¶ 16. Not once does the Agency state

10

what records systems exist within IMS, the relationship between those systems, or the basis by which Defendant deemed some (and presumably not other) record systems "relevant." *See Stalcup v. Dep't of Defense*, No. 13-cv-11967, 2018 WL 4963169, at *4 (D. Mass. Oct. 15, 2018). "Based on the vague and conclusory assertions in the CIA's declaration, the Court would be required to speculate in order to conclude that the agency's search efforts [used] methods which can be reasonably expected to produce the information requested." *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 132–33 (D.D.C. 2013) (internal quotation omitted).

The First Circuit recently considered similar declarations made by the Department of Defense, which it deemed "deficient in several respects." *Stalcup*, No. 16-1225, slip op. at 1. There, the requester challenged a search of the records of the Defense's Joint Staff and the decision to limit the search to only one record system. *Id.* at 3. The First Circuit agreed that the declaration at issue was "conclusory" and contrasted it with an adequate declaration provided *by the CIA* to the same requestor in a related case, in which the Agency "included a description of the missions, functions, and records systems of each Directorate, and explained why, based on the nature of the information sought, one Directorate was likely to have responsive records and the others were not." *Id.* at 9 (citing *Stalcup v. CIA*, 768 F.3d 65, 74 (1st Cir. 2014)). As the *Stalcup* cases show, Defendant is capable of providing an adequate description; it simply has not done so here. *See also Nat'l Sec. Counselors v. CIA*, 206 F. Supp. 3d 241, 258–59 (D.D.C. 2016) (Agency met its burden when it identified individuals who conducted the search, methods those individuals employed, names of record databases, and types of records contained therein).

Because the Agency's declaration fails to describe IMS' file structure, summary judgment in favor of Plaintiff is appropriate.

11

**B. The Agency's Declaration Is Inadequate, Because It Fails to Explain How Search Terms Were Combined to Identify Responsive Records.**

A second issue with the declaration concerns its description of the search terms used in this request. Defendant states in relevant part that "search personnel ran a number of terms including 'Twitter,' 'guides,' 'manuals,' 'policies,' 'OPA,' etc." Second Sellars Decl. Ex. J ¶ 15. Defendant provides no information on how those terms were combined, whether some or all of the terms needed to be present for a record to be identified, whether the terms appeared in the body of records or just their titles, or whether the Agency then culled the responsive records using other methods. This again frustrates the ability of either the Plaintiff or this Court to assess whether the search was adequately designed. *See Church of Scientology Int'l*, 30 F.3d at 233.

An agency must indicate how it combined its search terms and narrowed its results, not merely list the terms used. *Nat'l Day Laborer Org. Network v. ICE*, 877 F. Supp. 2d 87, 105 (S.D.N.Y. 2012) (court could not assess adequacy of search because agency listed eight search terms without describing "any connectives [such as and, or, w/10]" (alteration in original)); *Families for Freedom v. Customs & Border Prot.*, 837 F. Supp. 2d 331, 335 (S.D.N.Y. 2011) ("the method in which [the terms] are combined and deployed is central" to determining the adequacy of search). "The government will not be able to establish the adequacy of its FOIA searches if it does not record and report the search terms that it used, how it combined them, and whether it searched the full text of documents." *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 108.

This is especially important given the Agency's claim that no documents were found, despite the inclusion of broad search terms like "guides," "manuals," and "policies." Second Sellars Decl. Ex. J ¶ 17. It is possible the Agency conducted some undescribed process for narrowing

the search results, in which case the declaration is inadequate for that reason. *See Knight First Amendment Inst. at Columbia Univ. v. Dep't of Homeland Security*, 407 F. Supp. 3d 311, 326 (S.D.N.Y. 2019) (affidavit that omitted details like "how the agency narrowed its search results" was "patently incomplete"). Alternatively, it is possible—perhaps likely—that Defendant improperly limited the request to records that IMS officers *wrote themselves*, instead of those that IMS officers reference, consult, or review when approving content for the *@CIA* Twitter account. *See* Second Sellars Decl. Ex. J ¶ 17 (from Defendant's draft declaration, "the fact that no responsive records were located in the course of this search is entirely consistent with the scope of the IROs' duties, which do not include *the production* of formal training materials or instruction on what is appropriate for publication on social media" (emphasis added)). Without greater detail about the search terms used or the record systems searched, both the Court and the Plaintiff are left to wonder.

Here again, Defendant is capable of providing sufficient detail; it simply did not do so. In previous cases, the Agency has provided more comprehensive descriptions of how search terms were paired with each other and how the terms were connected within the search. *See* Shiner Decl. ¶ 12, *Hardway v. CIA*, 384 F. Supp. 3d 67 (D.D.C. 2019), ECF No. 20-1 (including search term descriptions such as "'hardway or hardaway or lopez or lopes or blakely or blakey near 'house select committee on assassinations' or 'hsca'"); Third Shiner Decl. ¶ 6, *Assassination Archives & Research Ctr., Inc. v. CIA*, 317 F. Supp. 3d 394 (D.D.C. 2018), ECF No. 24-1 (noting when terms were searched "using different iterations of phrases and unitary and combined terms," "in quotes" or "as individual words").[2]

---

[2] Copies of these Declarations are appended. Second Sellars Decl. Exs. K, L.

In an era when agency personnel "never actually look at the universe of documents they are searching," "the precise instructions that custodians give their computers are crucial." *Nat'l Day Laborer Org. Network*, 877 F. Supp. 2d at 106, 107. Accordingly, Dr. Johnson respectfully requests that the Court grant her motion for summary judgment.

## II.    OPA Employees Used Their Personal Email Accounts to Communicate with Twitter. Those Personal Accounts Must Be Searched.

The first part of Plaintiff's request seeks, in relevant part "emails and email attachments, discussing the CIA's public-facing Twitter account, *@CIA*, sent between Twitter, Inc. or a representative thereof, and any employee in the CIA's Office of Public Affairs." Compl. Ex. A, at 1, ECF No. 1-1. Defendant has now produced at least 55 emails in which OPA employees used personal email accounts in communications with Twitter. Second Sellars Decl. Ex. E, at 6. Yet, Defendant refuses to search the personal email accounts of relevant OPA staff. "[I]ndications in the produced documents that responsive documents existed elsewhere rebut [the] presumption" of good faith and necessitate an expanded search. First SJ Order 13.

Communications between OPA employees and Twitter staff about the *@CIA* account are agency records responsive to Plaintiff's FOIA request no matter where they reside. *See Competitive Enter. Inst.*, 827 F.3d at 149–50; *see also* First SJ Order 18–19 (ordering production of a record controlled by Defendant but located on Twitter's website). "If a department . . . can deprive the citizens of their right to know . . . by the simple expedient of maintaining . . . departmental emails on an account in another domain, [the purpose of the FOIA] is hardly served." *Competitive Enter. Inst.*, 827 F.3d at 150. No court examining this question has held that personal emails regarding official business are outside the scope of the FOIA.

14

From the records Defendant has provided to date, Plaintiff identifies 55 emails in which OPA employees used personal Gmail or AOL accounts in correspondence with Twitter, including 29 times CIA personnel sent emails from their personal accounts. Second Sellars Decl. Ex. E, at 6. This includes an email in which an OPA employee instructed Twitter staff to send work-related questions to a personal email account. *Id.* Ex. A, at 2 (Agency staff adds "CCing my home email, if you have any questions"). "[I]dentifying evidence that a specific private email address has been used for agency business" overcomes a presumption of a reasonable agency search if such accounts are not included in the search. *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 237 (D.D.C. 2017).

The Agency admits "the OPA employee at issue . . . used her personal address to conduct official business," but asserts that "anytime the CIA employee's personal account appears, the employee's official account is also ultimately copied." Second Sellars Decl. Ex. J ¶ 13. This is like measuring a baseball player's batting average by only looking at the times they had a hit. So far, only the Agency's work email accounts were searched, so a necessary characteristic of all email chains produced to date is that at some point an Agency work email address was copied. No mention is made of the steps the Agency took to confirm that records were not located personal email accounts. *See Windham v. Dep't of Hous. & Urban Dev.*, 140 F. Supp. 3d 163, 167 (D. Mass. 2015) (describing numerous agency efforts to confirm a lack of responsive records in other areas). A mere belief that a search would be duplicative does not excuse this lack of diligence. *ACLU Found. of Mass.*, 2016 WL 4411492 at *7 (ordering search of department acknowledged to contain responsive, but potentially duplicative, records).

Defendant also makes much of the fact that, in its hand-picked example record, "the only email sent *by* the CIA employee was sent from an official, rather than personal email account."

15

Second Sellars Decl. Ex. J ¶ 13. Plaintiff, though, has identified at least 29 emails in which OPA employees are writing to Twitter from personal email accounts. Second Sellars Decl. Ex. E, at 6; *e.g.*, Second Sellars Decl. Ex. A, at 4–5. Moreover, whether the emails were sent or received, they are records subject to the FOIA. *Competitive Enter. Inst.*, 827 F.3d at 150.

Once it is known that records may fall outside of official record systems, "[t]he official custodians must ask relevant employees if they used private email accounts relating to [the agency's] business and, if so, to produce the documents." *Brennan Ctr. for Justice v. Dep't of Justice*, 377 F. Supp. 3d 428, 435–36 (S.D.N.Y. 2019). The Agency must therefore search relevant personal email accounts for documents responsive to Plaintiff's FOIA request.

### III.   Recently Produced Records Demonstrate that the Office of the Director of the CIA Participated in the Strategy and Management of the @*CIA* Twitter Account. This Office Must Therefore Be Searched.

The new records produced by the Agency reveal that ODCIA was more deeply engaged in the review and instruction of the @*CIA* Twitter account than Defendant originally claimed, and must therefore be searched. *See* First SJ Order 14–15. Based on the extent of the engagement, there is "reliable evidence" that the existence of responsive records is likely. *Id.* at 14. The records produced by Defendant illustrate cross-dimensional instruction between the OPA and ODCIA about Twitter, with OPA staff educating ODCIA staff about the platform and ODCIA staff in turn providing their own thoughts about how the @*CIA* Twitter account should be run. See Second Sellars Decl. Ex. B at 8 (an OPA staff member asking for Twitter's help in "developing a briefing to present to all the stakeholders . . . with an explaination of what Twitter is"); *id.* at 36 (an OPA staff member explains some of Director Brennan's ideas for the agency's use of Twitter). To date, Defendant has only searched one side of this conversation.

16

Plaintiff understands ODCIA to include, among others, the Director of the CIA ("DCIA"), the Executive Director (now the Chief Operating Officer), the DCIA Chief of Staff, and the DCIA Deputy Chief of Staff. *See id.* Ex. N. The Agency's production shows that all of these officials were consulted before, during, and after the launch of the *@CIA* Twitter account. As early as July 2013, OPA staff prepared a briefing to ODCIA staff. *Id.* Ex. B, at 8. In May and June 2014 the OPA briefed several ODCIA personnel on the Twitter launch. *Id.* Ex. B at 2 ("Briefing our Executive Director on Friday – wish me luck!"), 12 (planning a meeting with the DCIA Deputy Chief of Staff), 14–16 (scheduling a meeting with the DCIA Chief of Staff). Then, in July 2014, OPA prepared a formal report for the Director with Twitter's assistance. *See id.* Ex. B at 18. In September 2015, OPA also delivered a "slide show" demonstrating Twitter's new polling tool to "a few select seniors." *Id.* Ex. B at 53. Emails from a few months prior include notes from a conversation apparently with Twitter, OPA, and ODCIA staff—including Director Brennan himself—where all discussed high-level ideas for the future of the *@CIA* account, including ideas for content selection, how to engage with other government branches on social media, and when to engage with the President's Twitter account. Second Sellars Decl. Ex. B at 21–23.

As a whole, the records reveal ODCIA's sustained interest and engagement with the Twitter account's operation, and ODCIA's input into the overall social media strategy for the Agency. "Presentations" of the kind described in the records provided are explicitly included in the second part of Dr. Johnson's request, and as the intended recipients of those presentations, ODCIA personnel's files likely contain a copy of them, as well as any written instructions, guidance, or feedback ODCIA personnel provided in response. *See id.* at 21 (listing ideas for Twitter content, including: "Video message from DCIA (his idea)"); *see ACLU Found. Of Mass.*,

2016 WL 4411492 at *8 (government component must search for records even if those records would have originated elsewhere). Taken together, the new records documenting ODCIA's involvement are "leads to other documents" that require the agency to "expand the scope of its search." First SJ Order 14.

## IV.     The Agency Must Release Segregable Information In Record C06779112.

The one record on which Plaintiff objects to an existing redaction is an email containing a discussion of two problematic Twitter accounts, in which Defendant redacted multiple pages citing Exemption (b)(3) and the National Security Act, 50 U.S.C. § 3024(i)(1).  Second Sellars Decl. Ex. C. The record discusses two accounts: one alleged to be "brand impersonation" and the other engaged in harassment. *Id.* at 1 (from the Twitter representative: "I would recommend filing a brand impersonation ticket for the [redacted] account. As for the other account you could probably best file a harassment ticket"). Both the text of the record and the description of the record in Defendant's *Vaughn* Index state that there are two accounts at issue. *See* Second Sellars Decl. Ex. H, at 2 ("This document is an email between CIA and Twitter discussing the removal of Twitter *accounts* that purport to be CIA or are used to harass." (emphasis added)).

 Plaintiff does not challenge the Agency's explanation for its redactions as it applies to portions of the record that address the allegedly harassing account. However, the Agency's explanation neither acknowledges the "brand impersonation" account nor discusses the segregability of the pages-long redaction within the '9112 Record, beyond the conclusory statement that "no additional, non-exempt information can be segregated and produced." Second Sellars Decl. Ex. J ¶ 22.

As a result of this failure, neither Plaintiff nor the Court can evaluate whether all reasonably segregable, non-exempt portions of the '9112 Record were released. *See* 5 U.S.C.

§ 552(a)(8)(A)(ii)(II); *Church of Scientology Int'l*, 30 F.3d at 231–32. Defendant does not explain why a trademark-like dispute over an impersonating account should be withheld as revealing "intelligence sources and methods." 50 U.S.C. § 3024(i)(1). And assuming it cannot be withheld on those grounds, Defendant fails to "describe what proportion of the information in [the] document is non-exempt and how that material is dispersed throughout the document." *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). A "general and conclusory assertion" regarding the lack of segregable information does not satisfy the agency's burden. *Church of Scientology Int'l*, 30 F.3d at 231.

The '9112 Record is especially important to Dr. Johnson's research, as it appears to document an effort by Defendant to enlist Twitter employees to block someone from Twitter on the grounds that the account is "impersonat[ing]" the Agency. Second Sellars Decl. Ex. C, at 2. Other records produced by the Agency reveal similar attempts, including apparent attempts to block parody accounts of the Agency. *Id.* Ex. D (requesting Twitter block numerous accounts, including one named "@BAD_CIA"). This sort of activity is not only central to Dr. Johnson's research on government use of social media, but also of greater public concern, as it raises the possibility that the Agency violated the First Amendment rights of the accountholders. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019) (the President's blocking of citizens who criticized him on Twitter violated the First Amendment).

In the absence of an adequate justification for the Agency's redactions, the Agency must release any reasonably segregable information. *Church of Scientology Int'l*, 30 F.3d at 228 (FOIA requires prompt release of segregable, nonexempt information). Because the Agency's explanation is so incomplete, this Court should order *in camera* review "to determine whether parts of a record could be released while keeping other parts secret." *Dep't of Justice v.*

19

*Reporter's Comm. for Freedom of Press*, 489 U.S. at 768. This remedy would enable the Court to "determine whether the failure of the affidavit stemmed from mere inadvertence or from a truly overbroad reading by the agency." *Maynard*, 986 F.2d at 557 (citation omitted). Moreover, "[*i*]*n camera* review is particularly appropriate when the documents withheld are brief and limited in number." *Id.* at 558; *accord. Mone v. Dep't of Navy*, 353 F. Supp. 2d 193, 196 (D. Mass. 2005). Thus, the Record '9112 is well-suited to *in camera* review.

Dr. Johnson respectfully requests that the Court order the release of all reasonably segregable information and conduct *in camera* review to ensure that all non-exempt information is in fact released.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted.

Respectfully Submitted

AMANDA JOHNSON

By her counsel,

/s/ Andrew F. Sellars
ANDREW F. SELLARS (BBO No. 682690)
BU/MIT Technology Law Clinic
Boston University School of Law
765 Commonwealth Avenue
Boston, MA 02215
sellars@bu.edu
Tel:    (617) 358-7377
Fax:    (617) 353-6944[3]

Date: July 10, 2020

---

[3] Pursuant to Local Rule 83.5.4(k), Plaintiff wishes to acknowledge the contributions of Boston University School of Law students and recent alumni Alexandra Clionsky, John Dugger, Justine Morris, Gavin Tullis, and Emily Zheng.

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, on July 10, 2020.

*/s/ Andrew F. Sellars*